No. 02-282

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 245

IN THE MATTER OF G.S., Jr., and S.S.,
       Youths in Need of Care.


APPEAL FROM:      District Court of the Sixth Judicial District,
                  In and for the County of Park,
                  The Honorable Wm. Nels Swandal, Judge presiding.


COUNSEL OF RECORD:

          For Appellant:

              Daniel Minnis, Montana Legal Services Association, Billings, Montana

          For Respondent:

              Mike McGrath, Montana Attorney General, Jennifer Anders, Assistant
          Montana Attorney General, Helena, Montana; Tara Depuy, Park County
      Attorney, Brett D. Linneweber, Deputy Park County Attorney, Livingston,
      Montana; Dee Killion, Eastern Shawnee Tribe, Seneca, Missouri (Tribal
      Representative); Vuko Voyich, Livingston, Montana (Guardian ad Litem)

          For Amicus:

              Kristine C. Lizdas, Battered Women's Justice Project, Minnesota Program
          Development, Inc., Minneapolis, Minnesota


                                          Submitted on Briefs: August 8, 2002

                                          Decided:  November 7, 2002

Filed:


_____
                    Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1      After a domestic violence incident between the natural parents of G.S. and S.S. and allegations the father assaulted G.S., the Department of Public Health and Human Services (DPHHS) removed G.S. and S.S. from the custody of their natural mother.  The State petitioned the Sixth Judicial District Court for temporary legal custody, and since G.S. and S.S. are Indian children as defined under the Indian Child Welfare Act (ICWA), ICWA was applied.  Following the hearing, the District Court found G.S. and S.S. to be youths in need of care and granted DPHHS temporary legal custody of the children for a period of 180 days.  The children's natural mother, Jaime, appeals from this order.  We affirm.

¶2      We restate the issues on appeal as follows:

        1.  Whether the District Court erred in determining DPHHS employed active efforts to prevent breaking up the Indian family;

        2.  Whether the District Court's order granting DPHHS temporary legal custody of the two Indian children was supported by clear and convincing evidence; and

        3.  Whether § 41-3-438, MCA (2001), is constitutional as applied in this matter.

### FACTUAL AND PROCEDURAL BACKGROUND

¶3      This case involves two minor children, G.S., now six years old, and S.S., now five, who were declared youths in need of care by the District Court and ultimately placed in therapeutic foster care.  The children's natural father, Gary, and the oldest child, G.S., are enrolled members of the Eastern Shawnee Tribe of Oklahoma (Eastern Shawnee Tribe), while S.S. is eligible for enrollment with the Tribe.  Therefore, ICWA is applicable to this

2

matter. A representative of the Eastern Shawnee Tribe participated in the disposition of this case in accordance with ICWA.

¶4     G.S. and S.S. came to the attention of DPHHS, following a report of domestic violence in Livingston, Montana. Gary, Jaime, and the children were on their way from Missouri to Washington, and stopped in Livingston for the night on November 20, 2001. Later that evening, the couple and their children were visting downtown Livingston, when Gary allegedly assaulted Jaime outside a local bar, and the police were called. In the mean time, Gary, Jaime, and the children returned to their motel, where Gary again allegedly assaulted Jaime.

¶5     Livingston Police Officer, Eric Severson (Severson), responded to the report and located the family at a local motel. When Severson arrived, Jaime answered the motel room door, appearing quiet and subdued and Severson noted her shirt was torn at the right shoulder. Severson observed two small children in the room and described Gary as agitated. Although Jaime was reluctant to report what happened, both children told Severson that Gary had choked Jaime. Severson arrested Gary and transported him to the county jail, while Jaime and the two children remained at the motel. Gary was charged with Partner Family Member Assault, to which he later plead guilty.

¶6     The day after the assault, Detective Michelle Morris (Morris) and social worker, Barbara Broughton (Broughton) interviewed the children. During the interview, G.S. explained that the previous night, after Gary assaulted Jaime outside the bar, Gary also grabbed G.S. by the throat and choked him when G.S. attempted to let his mother into the

3

car. Morris observed that G.S. had remnants of a black eye, bruising on his neck, and blotchy red spots on the whites of his eyes. Based upon these observations and G.S.'s statements, Morris concluded G.S. was being truthful. Upon examining G.S. that same day, a physician observed bruising consistent with choking or strangulation.

¶7 Morris also interviewed Jaime, who was uncooperative at first. Morris explained there were inconsistencies in Jaime's statements, particularly about prior incidents of Gary assaulting her. Morris also observed behavior consistent with lying (fidgeting, breathing heavily, no eye contact, acting nervous), and when she confronted Jaime about her untruthfulness, Jaime began to cry and then admitted that Gary had previously assaulted her on numerous occasions, including when she was pregnant with G.S. According to Morris, Jaime minimized Gary's abuse, explaining he was violent only when he was drunk or on drugs. While Jaime would not admit Gary abused the children, she did tell Morris he was a little overboard in punishments and would slap and drag the children.

¶8 Broughton, who had sixteen years of social work experience, was the initial social worker involved with the case. On November 21, 2001, after learning the family was traveling from Joplin, Missouri, Broughton inquired with social services in Missouri before she interviewed Jaime and the children. While she discovered there were no records of child abuse or neglect in Joplin, she did learn that Gary and Jaime had left the area without contacting the office of public assistance, from which they had received assistance. Like Morris, Broughton interviewed both Jaime and the children. Broughton testified that in addition to the incident in the car, G.S. told her that at the motel, Gary threw food at them,

4

locked Jaime out of the room, and also grabbed and scratched G.S. Broughton observed bruising on G.S.'s neck and scratch marks on his arm, and G.S. said he was scared of Gary when he threw things and choked him.

¶9 Broughton ultimately removed the children after concluding that Jaime had failed to protect the children. This decision was based on the children's presence during a domestic violence incident as well as Gary's physical abuse of G.S. In addition, Broughton noted there was an increased risk to the children considering they were under five years old at the time. Although Broughton knew Gary was incarcerated, after interviewing the children and Jaime, she decided to remove G.S. and S.S. from Jaime's care because of the children's exposure to unreasonable risk and Jaime's failure to protect them. Broughton also considered the fact that Jaime and Gary had left Missouri without notifying the public assistance office of their departure to be a risk factor, and an indication they may flee again. Broughton testified that she initially looked into the local battered women's shelter for Jaime, and admitted the children could have stayed with Jaime at the shelter. However, Broughton was informed that while the shelter may have been secured, there was nothing preventing the residents from leaving, and given the flight risk Jaime posed, Broughton chose to remove the children.

¶10 On November 26, 2001, the State filed a Petition for temporary legal custody, and the next day, the District Court signed a temporary order, granting temporary legal custody to DPHHS and set a hearing on the petition for December 7, 2001. After learning G.S. and S.S. were either enrolled or eligible for enrollment with the Eastern Shawnee Tribe, the State filed an amended petition for temporary legal custody on December 3, 2001, and gave notice of

5

the proceedings to the Tribe. The Eastern Shawnee Tribe filed an entry of appearance on December 18, 2001, and the hearing was rescheduled for January 15, 2002.

¶11 At the hearing, the State presented testimony from the arresting officer, the emergency room doctor who examined G.S., Morris, Broughton, Stacey Jesson (Jesson), the social worker assigned to the case, and two representatives from the Eastern Shawnee Tribe, Christy Mulholland (Mulholland), and Dee Killion (Killion). Jaime testified on her own behalf and called her counselor, Diane Boehm (Boehm), and Sandra Glenn (Glenn), who worked at the women's shelter, to testify. Gary neither testified, nor called any witnesses.

¶12 Jesson, who was assigned to the case after the children were removed, worked on finding placement for the children, and explained there were no family members in the Livingston area with whom she could place the children. Upon discovering that G.S. and S.S. may be Indian children, she contacted their Tribe and also inquired with specialists and resource workers around the state in an attempt to locate a suitable Native American home. According to Jesson, when she informed the Eastern Shawnee Tribe that she was unable to place the children with other tribal members, the Tribe told her that as long as the children were safe, DPHHS was in compliance with ICWA.

¶13 Jesson also testified about her interactions with Jaime, and explained that she did not feel Jaime was forthright with her, noting that Jaime initially told Jesson there was absolutely no history of abuse, leaving Jesson to later discover Gary's extensive history of domestic violence. She also noted that Jaime would change her story within minutes of giving a different story. Jesson explained that when she asked Jaime if the family had any previous

6

involvement with Child Family Services, Jaime replied that they had not. However, Jesson discovered that family services in Maine and Florida, where several abuse and neglect allegations had been substantiated, had been involved with the family. Jesson described some of the specific instances of abuse, which included Gary assaulting Jaime when she was pregnant with G.S., and Gary choking Jaime, leaving bruises on her throat. Significantly, the children were present during nearly every one of the domestic violence incidents, and according to Jesson, alcohol was usually involved and Jaime often bailed Gary out of jail.

¶14 Jesson testified that because the family was passing through Montana, they had no family support nearby. Given that Jaime told Jesson she wanted to take the children back to Florida, and Jaime's repeated reunifications with Gary following domestic abuse, Jesson considered Jaime a flight risk. According to Jesson, S.S. was very angry and aggressive. She explained that both children were fearful and talked constantly about the abuse cycle, being slapped and pushed around, and also about protecting their mother. Jesson conceded that DPHHS was not alleging that Jaime directly abused either G.S. or S.S. Rather, Jesson explained that DPHHS was concerned with Jaime's inability to protect the children from Gary's abuse and from witnessing Gary's abuse of Jaime, noting the repeated patterns of abuse and Jaime consistently returning to Gary.

¶15 Jesson explained that services such as chemical dependency evaluation and counseling and self study parenting materials were provided for Gary while he was incarcerated. Jesson testified that once the children were placed in a therapeutic foster home in Bozeman, she suggested Jaime stay at the Bozeman women's shelter to be near them. However, Jaime

7

chose to not to move, telling Jesson that she felt more comfortable in Livingston. While Jesson acknowledged that Jaime had been complying with the recommendations and participating in the suggested programs, she felt Jaime had not progressed to the point that Jesson would feel comfortable returning the children to her, and she also still considered Jaime a flight risk. Jesson explained that in her opinion it was not in the children's best interests to remain with Jaime while she worked on proposed treatment plans because of the children's fear that when they are with their mother, Gary will return and abuse her again. Jesson added that once DPHHS feels Jaime is able to protect her children, they can be reunited, and explained that the reason behind removing the children was not to prevent the cycle of abuse, but rather to protect the children until Jaime learned how to deal with the cycle of abuse.

¶16    Mulholland, who worked with the Eastern Shawnee Tribe child protection services, interviewed Gary, Jaime, and the children and also reviewed all the reports of domestic violence from Florida, Maine, and the current Montana incident. She described some inconsistencies in Jaime's account of the events and was concerned that Jaime knew there was a pattern of domestic violence, but still refused to divulge all the information pertaining to the domestic violence. Mulholland considered the inconsistencies in Jaime's statements as indications that Jaime minimized the dangers associated with domestic violence. Mulholland testified that on several occasions when Gary had been arrested, Jaime either bailed him out or automatically let him back into the home, which just continued the cycle of abuse. Based on her review of the case files from other states, Mulholland observed that when family

8

services became involved with Gary, Jaime and their children, there was a pattern of the couple either failing to take advantage of the programs, or leaving the jurisdiction that was trying to help them.

¶17    Killion, who works with the Eastern Shawnee Tribe's Department of Children and Family Services, as Director of Indian Child Welfare, was accepted as an Indian Child Welfare Expert under 25 U.S.C. § 1912.  Killion interviewed the children, Jaime, and Gary, and also had access to the family services reports from Florida, Maine, and Montana.  Killion testified that there were several discrepancies between the reports and what Jaime said during the interview, and added that Jaime had denied there had been any domestic violence.  Jaime also told Killion she intended to leave immediately for Florida once she got her kids back.  Killion was concerned that Jaime would not be able to protect the children until she took care of the problems she faced in regards to the domestic violence from Gary.

¶18    Killion explained that based on the family services reports and history of domestic violence, she had concerns about returning the children to Jaime, particularly since the cycle of domestic abuse is not broken quickly and it appeared Jaime had difficulty admitting domestic abuse occurred.  Killion explained that until an abused person admits it occurs and that they need help, it is difficult to break the cycle of domestic abuse, and added that because the children were present for much of the domestic violence, they experienced emotional abuse.  Killion, taking into account the Tribe's cultural norms, opined that giving continued custody of G.S. and S.S. to Jaime would likely result in serious emotional or physical damage to the children.  However, when asked what empirical studies showed the

9

causal connection between witnessing domestic violence and subsequent psychological abuse or damage, Killion replied she knew of none. Killion did agree that the fact an abuser is more likely to come from an abusive home is an indication that there is some level of emotional abuse incurred from witnessing domestic violence.

¶19 According to Killion, without intervention, neither Gary nor Jaime would modify their behavior and would likely repeat the same behaviors involved with the cycle of abuse. Killion recommended that the children remain in a therapeutic foster home under the temporary legal custody of DPHHS, that Jaime continue to work on her treatment plan and that Gary be provided a treatment plan developed by Killion and DPHHS. Killion testified that in her opinion, Jaime would be unable to break the domestic violence cycle without a treatment plan that emphasized counseling, and further explained it was too soon to reunite the children with Jaime, because adding the responsibility of the children on top of Jaime's commitments under the treatment plan would be overwhelming and perhaps set Jaime back in her progress.

¶20 Boehm, a licensed clinical professional counselor, testified on behalf of Jaime and explained that one component of the cycle of abuse was the "learned helplessness" syndrome, explaining that after exposure to traumatic events it is typical for the person being traumatized to feel there is no way out of the situation, and to seek to preserve the family. Boehm explained that victims of "learned helplessness" syndrome often develop safety plans for their children, adding that when Gary became intoxicated, Jaime would generally make sure the children were not in the room. Boehm diagnosed Jaime with Post-Traumatic Stress

Disorder, which involves avoidance, confusion and hypervigilance, and explains why Jaime's statements were often inconsistent. However, Boehm admitted that she was not an enrolled member of any tribe, had never lived on a reservation, did not have any background with the Eastern Shawnee Tribe, and had learned of the relevant factual events in this case only from Jaime. Boehm conceded that although a parent in a domestic violence situation may feel there is no way out, children should not be left in a dangerous situation, and admitted that even if they make safety plans, the victim-parent will sometimes return to that dangerous situation. Significantly, the District Court found that Boehm's conclusions carried little weight in addressing the merits of the case since she was not a qualified expert under ICWA and she had limited first-hand knowledge in the case.

¶21    At the hearing, Jaime admitted there was a history of domestic abuse between her and Gary, but explained that alcohol and drugs are the only triggers of Gary's violence, and that she tries to protect the children from Gary by keeping them away from him when he drinks, usually by putting them to bed early. However, Jaime conceded that she does not have an ability to anticipate when Gary will get angry and that the ability to determine how much liquor is too much is not very precise. Jaime also explained that five months before the hearing she realized she should end the relationship with Gary, but after he purportedly completed a treatment program, she reunited with him. Jaime testified that since the children's removal, she had secured a home and a job, was taking parenting and GED classes, and also participating in counseling.

11

¶22    The District Court entered its Findings of Fact, Conclusions of Law and temporary legal custody order on February 12, 2002.  The court concluded that given the continued cycle of domestic abuse, there was clear and convincing evidence that Jaime had not realized that, even if not necessarily physically harmed, the children were being damaged psychologically, which caused serious emotional damage.  Based on her failure to protect the children from Gary's physical and psychological abuse and serious emotional damage, the court concluded Jaime subjected the children to psychological abuse and serious emotional damage.  Thus, the District Court concluded the statutory criteria for temporary legal custody, including 25 U.S.C. § 1912(e) of ICWA, which allows for foster care placement, was satisfied by clear and convincing evidence.  The court also concluded that as required under 25 U.S.C. § 1912(d) of ICWA, DPHHS had made active efforts to provide remedial and rehabilitative services designed to prevent the breakup of the family.  The children were adjudicated as youths in need of care, and DPHHS was granted temporary legal custody for a period of 180 days.

¶23    A dispositional hearing, pursuant to § 41-3-437(6)(b), MCA (2001), was held on February 25, 2002, and the District Court entered its Order on March 8, 2002, wherein it incorporated its February 12, 2002 Findings of Fact and Conclusions of Law.  The court again found the children were youths in need of care and continued its previous order granting temporary legal custody to DPHHS.  It is from this final order that Jaime appeals.[1]

---

[1]Under ICWA, the parent of an Indian child has to right to petition any court of competent jurisdiction to invalidate any action for foster care placement or termination of parental rights upon a

**STANDARD OF REVIEW**

¶24 We review a district court's findings of fact to determine whether they are clearly erroneous. *In re M.P.M.*, 1999 MT 78, ¶ 12, 294 Mont. 87, ¶ 12, 976 P.2d 988, ¶ 12 (citing *Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904, 906). Findings of fact are clearly erroneous if they are not supported by substantial evidence; or, if so supported, the district court misapprehended the effect of the evidence; or, if so supported and the district court did not misapprehend the effect of the evidence, this Court is left with the definite and firm conviction that a mistake has been committed. *In re S.M.*, 1999 MT 36, ¶ 15, 293 Mont. 294, ¶ 15, 975 P.2d 334, ¶ 15 (citing *In re E.W.*, 1998 MT 135, ¶ 10, 289 Mont. 190, ¶ 10, 959 P.2d 951, ¶ 10). We review a district court's conclusions of law to determine whether its conclusions are correct. *In re M.P.M.*, ¶ 12 (citing *Matter of J.J.G.* (1994), 266 Mont. 274, 281, 880 P.2d 808, 812).

**DISCUSSION**

**Issue 1**

¶25 **Did the District Court err in determining DPHHS employed active efforts to prevent breaking up the Indian family?**

¶26 The Indian Child Welfare Act applies only to child custody proceedings in state courts. *See* 25 U.S.C. § 1901, et seq. While ICWA requires such threshold determinations as whether the child involved is an "Indian child" as defined under 25 U.S.C. § 1903(4), and

showing that such action violated 25 U.S.C. §§ 1911, 1912, or 1913. *See* 25 U.S.C. § 1914. *See also, Matter of M.E.M.* (1984), 209 Mont. 192, 195-96, 679 P.2d 1241, 1243.

13

what court has jurisdiction over the matter, *see* 25 U.S.C. § 1911, the case *sub judice* involves the placement of two Indian children in therapeutic foster care and the District Court's order granting temporary legal custody of the children to DPHHS.  Under ICWA,

> (d)  Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

> (e)  No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

> (f)  No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. §§ 1912(d), (e), and (f) (hereinafter, § 1912(d), § 1912(e), and § 1912(f), respectively).  Since this case involved temporary legal custody and foster care placement, Jaime appeals the District Court's determinations under § 1912(d) and § 1912(e).  We address her arguments concerning § 1912(d), first.

¶27      Jaime contends DPHHS failed to implement any remedial or rehabilitative programs designed to prevent breakup of the family as required under § 1912(d) of ICWA, and notes the children were removed the morning after Gary was arrested for assaulting Jaime.  Jaime argues that Broughton, the social worker who removed the children, failed to pursue any placement opportunities other than the local women's shelter prior to concluding

14

that Jaime's flight risk justified DPHHS's decision not to allow the children to go to the shelter with their mother. Jaime contends DPHHS's assessment of Jaime as a flight risk did not relieve its duty to prevent the breakup of the family.

¶28    In its Findings of Fact, the District Court found that Broughton initially attempted to prevent removal of the children and had investigated the possibility of Jaime and the children residing together at the women's shelter. However, the court found that Broughton correctly concluded that without removal, there was no way to ensure the children's safety and welfare, referring to the fact the family was in transit, Jaime denied any abuse when the evidence was clear to the contrary, and Jaime failed to take active steps to protect the children. The court also found that Jaime was a flight risk if the children were returned to her, and also found DPHHS properly attempted to locate suitable placement for the children with Native American homes or extended family. Finally, the court found that remedial and rehabilitative programs were provided to both Jaime and Gary in an effort to prevent breaking up the family, which included counseling, assistance in placement at the shelter, parenting classes, and employment.

¶29    While § 1912(d) does not set out detailed procedure or criteria for determining the sufficiency of such efforts, we note that in the Bureau of Indian Affairs Guidelines for ICWA (Guidelines), commentary for Guideline D.2 provides that "[e]stablishing such procedures and requirements would involve the court in second-guessing the professional judgment of social service agencies. The Act does not contemplate such a role for the courts and they

15

generally lack the expertise to make such judgments." 44 Fed. Reg. 67,592 (November 26, 1979).

¶30    Unlike § 1912(e), which requires an Indian child's placement in foster care to be supported by clear and convincing evidence, § 1912(d) lacks any express language setting out an evidentiary standard. Subsection (d) requires that the party seeking either termination of parental rights or foster care placement must "satisfy the court" that unsuccessful active efforts were employed to prevent the breakup of the Indian family. *See* § 1912(d). In this case, the District Court did not apply a specific evidentiary standard when in concluded DPHHS made sufficient active efforts under § 1912(d). While neither party challenges the District Court's omission of a specific evidentiary standard, we conclude that in order to properly review the court's conclusion, we must establish the appropriate evidentiary standard for making determinations under § 1912(d). As this is an issue of first impression in Montana and involves a federal provision, we look to other jurisdictions for guidance.

¶31    There is a split of authority as to what evidentiary standard is required under § 1912(d). One group of states requires the same burden of proof as the underlying ICWA proceeding (i.e., requires proof beyond a reasonable doubt of compliance with § 1912(d) when the underlying proceeding is for termination of parental rights under § 1912(f)). *See, Matter of Welfare of M.S.S.* (Minn. Ct. App. 1991), 465 N.W.2d 412; *People in Interest of S.R.* (S.D. 1982), 323 N.W.2d 885; *Matter of Kreft* (Mich. Ct. App. 1986), 384 N.W.2d 843; and *In re L.N.W.* (Iowa Ct. App. 1990), 457 N.W.2d 17. Another group of states adopts a lesser evidentiary standard based on state laws either as applied to the underlying proceeding

16

(*see*, *In re Annette* P. (Me. 1991), 589 A.2d 924; *In re Dependency of A.M.* (Wash. Ct. App. 2001), 22 P.3d 828; and *In re M.S.* (N.D. 2001), 624 N.W.2d 678), or based upon the services provided to the parents (*see*, *K.N. v. State* (Alaska 1993), 856 P.2d 468; *Matter of Baby Boy Doe* (Idaho 1995), 902 P.2d 477; and *In re Michael G.* (Cal.App. 4th Dist. 1998), 74 Cal.Rptr.2d 642).

¶32    Our statutes provide that, if an abuse and neglect preceding under Chapter 3, Title 41 of the Montana Code "involves an Indian child, as defined in the federal Indian Child Welfare Act, 25 U.S.C. 1901, et seq., the standards of proof required for legal relief under [ICWA] apply."  Section 41-3-422(5)(b), MCA.  Moreover, this Court has recognized the importance of preserving Indian culture, noting that the reasonable doubt standard of proof applied in ICWA "was intended by Congress to stop the all-too-common removal of Indian children from their Indian families, and thus tribal culture, 'by non-tribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing.' "  *In re K.H.*, 1999 MT 128, ¶¶ 20-21, 294 Mont. 466, ¶¶ 20-21, 981 P.2d 1190, ¶¶ 20-21 (quoting *Mississippi Choctaw Indian Band v. Holyfield* (1989), 490 U.S. 30, 34-35, 109 S.Ct. 1597, 1601, 104 L.Ed.2d 29, 38).

¶33    Therefore, given the intent of Congress in preserving Indian families and this State's commitment to preserving Indian culture, we conclude that the proper evidentiary standard for determining "active efforts" under § 1912(d) is the same standard we apply to the underlying ICWA proceeding.  *See Matter of M.S.S.*, 465 N.W.2d at 418 (in a termination of parental rights proceeding, proving compliance with § 1912(d) beyond a reasonable doubt

17

was compelled when considering Congressional intent to prevent culturally biased governmental agencies from erroneously placing Indian children without considering Indian Culture). Thus, if the proceeding before the district court contemplates foster care placement pursuant to § 1912(e), as the case *sub judice* does, a court must be satisfied by "clear and convincing evidence" that active efforts pursuant to § 1912(d) were provided and proved unsuccessful. If, on the other hand, the underlying proceeding is termination of parental rights under § 1912(f), the district court must be satisfied by proof "beyond a reasonable doubt" that § 1912(d) has been met. Applying this standard here, we conclude the record shows by clear and convincing evidence that active efforts were employed by DPHHS to provide remedial and rehabilitative services.

¶34 First, we disagree with that part of Jaime's argument that infers remedial and rehabilitative programs should have been offered before the children were removed. It is unrealistic, given the complex nature of the issues involved with abuse and neglect proceedings as well as the often emergent circumstances, to require DPHHS to demonstrate compliance with § 1912(d) <u>prior to</u> a show cause hearing on the underlying proceeding. The plain language of Subsection (d) requires that the party "seeking to effect" either foster care placement or termination of parental rights must "satisfy the court that active efforts . . . *have been made* to prevent the breakup of the Indian family." *See* § 1912(d) (emphasis added). Thus, DPHHS must work towards meeting these requirements from the time it becomes involved with a family until a show cause hearing is held. *See also, State ex rel. Juv. Dept. v. Charles* (Or. Ct. App. 1984), 688 P.2d 1354, 1358, *rev. dismissed* 701 P.2d 1052 (1985)

18

(relying on the "to effect" language of § 1912(d), court concluded the showing under Subsection (d) need only be made during a hearing on the merits of foster care placement or parental rights termination).

¶35     At the time G.S. and S.S. were removed from their mother's care, their father was incarcerated and their mother had no financial security, with her only option for living quarters being the local women's shelter.  However, in the opinions of Broughton, Jesson and Mulholland, Jaime posed a flight risk based on the family's transitory situation and the couple's history of leaving other states where they were receiving assistance.  Broughton's decision to remove the children was based on several factors, including Jaime's flight risk, the shelter's policy to allow residents to leave, and Jaime's failure to protect her children as evidenced by Jaime's repeated reunification with Gary following domestic abuse incidents.  Significantly, once Jesson realized the children were Indian children as defined under ICWA, she inquired about placement with local Native American families as well as the possibility of other placements with the Eastern Shawnee Tribe.  Finally, it is clear that DPHHS also began implementing services for both Jaime and Gary prior to the show cause hearing.

¶36     Moreover, we conclude the efforts employed by DPHHS were designed to remedy Jaime's problems that were associated with removal of the children.  *See, Letitia v. Superior Court* (Cal.App. 4th Dist. 2000), 97 Cal.Rptr.2d 303, 309 (Common sense construction of the meaning of "active efforts" requires only that "timely affirmative steps be taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designated to remedy problems which might lead to

19

severance of the parent-child relationship."). While Jaime demonstrated progress with the services and programs provided, we conclude the efforts employed by DPHHS were not yet successful, as evidenced by Killion's and Jesson's opinions that introducing the children back to Jaime's daily life would hinder any progress with her proposed treatment plan.

¶37 We conclude the District Court's findings concerning the efforts made by DPHHS were not clearly erroneous and that while it did not identify and apply a specific evidentiary standard, clear and convincing evidence supported the court's determination that DPHHS employed active, yet unsuccessful, efforts to provide remedial and rehabilitative services designed to prevent the breakup of the family.

**Issue 2**

¶38 **Was the District Court's order granting DPHHS temporary legal custody of the two Indian children supported by clear and convincing evidence?**

¶39 The Indian Child Welfare Act states in relevant part,

> (e) No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912. *See also*, *Matter of L.F.* (1994), 266 Mont. 461, 465, 880 P.2d 1365, 1368 (when appealing court's decision to place children in foster case for several months, "the lesser 'clear and convincing' burden is used to protect the best interests of the children").

Clear and convincing proof requires

> that a preponderance of the evidence be definite, clear, and convincing, or that a particular issue must be clearly established by a preponderance of the

evidence or by a clear preponderance of proof. This requirement does not call for unanswerable or conclusive evidence. The quality of proof, to be clear and convincing, is somewhere between the rule in ordinary civil cases and the requirement of criminal procedure-that is, it must be more than a mere preponderance but not beyond a reasonable doubt.

*In re E.K.*, 2001 MT 279, ¶ 32, 307 Mont. 328, ¶ 32, 37 P.3d 690, ¶ 32 (citing *In re J.N.*, 1999 MT 64, ¶ 12, 293 Mont. 524, ¶ 12, 977 P.2d 317, ¶ 12).

¶40    The District Court found that Gary had an extensive criminal history including several assaults on Jaime, Gary and Jaime historically failed to take advantage of child protective services in other states, preferring to flee the area instead, and Jaime downplayed Gary's violence toward her. The court also found Jaime denied any domestic abuse when the evidence was clear to the contrary and found Jaime failed to take active steps to protect the children from domestic violence. Based on the testimony of Killion, a qualified ICWA expert who took the cultural norms of the Tribe and community into consideration, the court found that given the continued cycle of abuse, Jaime did not realize the children were being damaged psychologically and had suffered serious emotional damage.

¶41    The District Court concluded there was clear and convincing evidence that allowing Jaime and Gary continued custody of the children would likely result in serious emotional or physical damage to the children. In addition, the court concluded that without intervention, including treatment plans and services, Gary and Jaime would likely repeat their previous behaviors, thus subjecting the children to domestic violence which causes physical and psychological damage. Such damage, concluded the court, was not a cultural norm of any culture, let alone the Tribe.

21

¶42    Jaime argues that since DPHHS's intervention was based on Gary's abuse and Jaime's failure to protect the children from Gary's abuse, Gary's incarceration eliminated any possibility that the children could be abused. Contending that G.S. and S.S. were no longer in danger, Jaime argues the court's decision to remove the children from her care contravenes the policy of preserving the family integrity whenever possible. Finally, while Jaime concedes that "the record is replete with claims of [her] flight risk, her questionable credibility and her previous reconciliations with her abuser," it was improper to grant temporary legal custody based on speculations of future flight and reconciliation.

¶43    We disagree that the past conduct of Gary and Jaime was not relevant, or that the court relied on mere speculation in making its conclusions. In proceedings to terminate parental rights under § 41-3-609, MCA, we have consistently concluded that a parent's past conduct is relevant in determining whether that parent's conduct is unlikely to change. *See*, *In re E.K.*, ¶ 47 (citing *In re M.A.E.*, 1999 MT 341, ¶ 37, 297 Mont. 434, ¶ 37, 991 P.2d 972, ¶ 37). We have repeatedly stated that "we do not have a crystal ball to look into to make this determination, so it must, to some extent, be based on a person's past conduct." *In re E.K.*, ¶ 47 (citing *In re M.A.E.*, ¶ 37). This same rationale is relevant here, and we conclude that clear and convincing evidence supports the District Court's conclusion that Jaime's continued custody of the children would likely result in serious emotional or physical damage to the children.

¶44    Even though Gary was incarcerated, DPHHS had legitimate reason to believe that Jaime might flee with the children given the opportunity. Moreover, considering her

22

repeated history of returning to Gary after incidents of domestic violence that were often witnessed by the children, Jaime demonstrated an inability to protect the children from physical abuse or the psychological and emotional effects of living in an abusive home. Jaime testified that in the Summer of 2001 she recognized the need to separate herself from Gary, however, following the November 2001 incident in Livingston, Jaime's behavior--denying any past domestic abuse or involvement with child protective services--validated DPHHS's concern that Jaime is unable or unwilling to prioritize the safety of G.S. and S.S. over her relationship with Gary.

¶45     We conclude that the District Court's order granting DPHHS temporary legal custody of the children was supported by clear and convincing evidence.

**Issue 3**

¶46     **Is § 41-3-438, MCA (2001), constitutional as applied in this matter?**

¶47     Citing Title 41 of the Montana Code, Jaime argues that Montana's abuse and neglect statutes are unconstitutional as applied because they allow separation of children from their parents when there is no danger of future harm. The State contends Jaime failed to adequately preserve her constitutional challenge and is thus barred from raising it. Jaime counters that she made several references to this constitutional issue in the record, citing her reply brief, proposed findings of fact, and an assertion of due process violations during the hearing.

¶48     While the record does reflect some "references" to constitutional issues, they were general in nature and failed to alert the District Court to the specific statute and constitutional

23

provisions that formed the basis for her objection. This Court has held that **a party must specify in the trial court what authority, rule, statute, or constitutional provision might be violated by a decision contrary to the party's position, and that failure to do so fails to preserve that issue for appeal.** *State v. Huerta* **(1997), 285 Mont. 245, 261, 947 P.2d 483, 493 (citing** *State v. Loh* **(1996), 275 Mont. 460, 479, 914 P.2d 592, 603-04). Moreover, we have concluded that "broad, general objections do not suffice" and that the objecting party has an obligation to the district court to clearly articulate the grounds for the objection so the court may correct itself.** *State v. Weeks* **(1995), 270 Mont. 63, 85, 891 P.2d 477, 490-91 (citation omitted).** *See also, City of Missoula v. Campbell***, 2001 MT 271, ¶ 13, 307 Mont. 286, ¶ 13, 37 P.3d 670, ¶ 13 ("It is fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider."), and** *In re Custody of M.W.,* **2001 MT 78, ¶ 31, 305 Mont. 80, ¶ 31, 23 P.3d 206, ¶ 31.**

¶49    Moreover, we emphasize that Jaime's constitutional argument on appeal is an "as applied" challenge, and as we concluded above, the record supports the District Court's conclusion that continued custody by Jaime was likely to result in serious emotional or physical damage to G.S. and S.S. While Jaime contested the psychological/emotional harm issue throughout the hearing, and even elicited a concession from Killion that she knew of no empirical studies showing a correlation between witnessing domestic abuse and emotional or psychological harm, we conclude the evidence presented to the District Court was nonetheless sufficient for it to conclude that returning the children to Jaime would likely

24

result in either physical abuse or psychological damage given the couple's history of domestic violence and reunifications, Jaime's failure to admit to and deal with the history of domestic violence, and Gary's assault on G.S. in Livingston.

¶50   For these reasons, we decline to address Jaime's constitutional challenge.  Accordingly the District Court's judgment, granting temporary legal custody of G.S. and S.S. to DPHHS is affirmed.

/S/ PATRICIA COTTER


We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ TERRY N. TRIEWEILER
/S/ JIM RICE