149 P.3d 1073 (2006)
2006 OK CIV APP 153
In the Matter of H.J., a Child under 18 years of age.
Jennifer Johnson, Natural Mother, Appellant,
v.
State of Oklahoma, Appellee.
No. 103,143.
Court of Civil Appeals of Oklahoma, Division No. 3.
August 11, 2006.
Certiorari Denied November 20, 2006.
David C. Morse, Tulsa, OK, for Appellant.
Deborrah Ludi Leitch, Assistant District Attorney, Tulsa County District Attorney's Office, Tulsa, OK, for Appellee.
Don Fugate, Assistant Public Defender, Tulsa, OK, for the Child.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 3.
Opinion by KENNETH L. BUETTNER, Chief Judge.
¶ 1 Natural Mother Jennifer Johnson's child, H.J., was adjudicated deprived after non-jury trial in September 2004. The basis for the adjudication was failing to protect the young teenager from physical abuse from Mother's brother (Uncle), who lived in the household. An essential part of Mother's treatment plan was to arrange housing for herself and H.J. away from Uncle. She could find new housing or have him move. When neither of these events occurred and the child remained in foster care, the State moved to terminate Mother's parental rights. After trial to a jury, her parental rights were terminated. The child is an Indian child and the Cherokee Nation was notified and intervened during the process, pursuant to the Oklahoma Indian Child Welfare Act, 10 O.S. 2001 § 40 et seq. Mother contends that the State and Tribe failed to prove, beyond a reasonable doubt, that they performed "active efforts" to reunite Mother and H.J. We affirm.
¶ 2 It is the policy of the State of Oklahoma through the Oklahoma Indian Child Welfare Act to ". . . ensure that the intent and provisions of the federal Indian Child Welfare Act are enforced." 10 O.S.2001 § 40.1. The federal Indian Child Welfare Act of 1978, 25 U.S.C.A. § 1912(d), "Remedial services and rehabilitative programs; preventive measures," states:
Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these have proved unsuccessful. (Emphasis added.)[1]
¶ 3 Section 1912(d) does not contain a burden of proof. There is a split of authority in other states as to whether "active efforts" must be proven beyond a reasonable doubt or some other standard.
¶ 4 Oklahoma has not adopted an evidentiary standard for § 1912(d). Mother argues, without citation of authority, that "due process" requires that the trial court apply the "beyond a reasonable doubt," standard to the "active efforts" determination. It is her position that the State's evidence did not rise to this level. State responds that it is not *1075 the status of the law which is at issue, rather the sufficiency of the evidence is at issue. It is State's position that it met its evidentiary burden.

FACTS
¶ 5 Mother's household consisted of herself, H.J., her mother, and Uncle. Uncle was unemployed and was known to be a closet drinker. The incident that started the State involvement with this family occurred March 24, 2004. H.J. allegedly was unhappy that the family was having oven, rather than delivery, pizza for supper. A piece fell to the floor. Uncle wanted H.J. to eat that piece anyway. An argument ensued during which the State alleged Uncle slapped H.J. on the cheek, dragged her to her mother's room, threw a lamp and suitcase at her and hit her on the head with a plastic cafeteria-style plate.
¶ 6 A Petition and Emergency Order were filed April 1, 2004 and H.J. was placed in the custody of the Department of Human Services. The Cherokee Nation filed a Notice of Intervention May 12, 2004. Mother's individual service plan (ISP) included three risk factors that she was required to correct: (1) not allow anyone to discipline her child except herself, and then use only appropriate discipline; (2) attend individual and family therapy with her child, regarding her child's inappropriate behaviors and disrespect for adults and authority; and (3) obtain housing for herself and her child.[2]
¶ 7 Mother never moved from the house that she shared with her mother and Uncle. During an unsupervised visit, Uncle playfully attempted to break up a wrestling match between Mother and H.J. by tapping the child on the rear. Although there was no allegation that the touching was inappropriate or disciplinary, H.J. reacted with psychological distress.
¶ 8 State's Motion to Terminate Mother's Parental Rights was filed December 15, 2005 on the grounds of failure to correct the conditions which led to the adjudication (failure to protect) and that H.J. had been in foster care for over fifteen months. 10 O.S.2001 § 7006 1.1(A)(5) and (15).
¶ 9 Mother contends that the State and Tribe did not prove, beyond a reasonable doubt, that they performed "active efforts" to reunite the family. It is clear from reading Mother's brief that what she challenges is whether the State's evidence with respect to "active efforts" was sufficient for the trial court to make its determination that remedial services and rehabilitative programs were offered to keep the family together, but that these proved unsuccessful. Therefore, we will note the evidence with respect to "active efforts."
¶ 10 When called by the State to testify, Mother stated that the ISP was not overly burdensome; in fact, it was easy. She attended counseling sessions. She did not obtain separate housing. She recalled one court review when the Court advised her that she had thirty days to obtain separate housing. When asked if she understood what would happen if she did not, she responded: "I guess I was going to lost [sic] my daughter." She was also asked if she knew who Rebecca Hull was. Mother testified that she knew Hull's job was to keep Indian families together. She denied that Hull worked closely with her. Mother stated that she asked Hull whether the tribe had any assistance for her, any money, so she could move out, and that Hull responded in the negative. She further stated that they did not offer her tribal housing. When asked if Hull would testify differently then would she be lying, Mother responded "Yes, because I asked her for help." The State also asked Whether Hull offered to help with the Tulsa Housing Authority by driving Mother there and helping her fill out an application. Mother answered that she had already filled out an application and in any event, the THA wanted $385 down plus utilities. She agreed that when the court offered to let her have an unsupervised visit with H.J., it was for the purpose of keeping the family together, to give her another chance. She stated she knew that her court papers required her to *1076 be the one who disciplined her child. Even though she did not believe that Uncle's tapping her daughter on the rear to break up the wrestling match was disciplinary or abusive, she testified that it could have been handled differently. He could have just said, "Hey, y'all break it up." Several weeks later, at a therapy session which included H.J., Mother, Grandmother, Uncle, and two of H.J.'s therapists, H.J. refused to come out of the bathroom.
¶ 11 When asked why she did not move, Mother responded (1) they gave me hope that my child would be returned; (2) the money situation; and (3) the abuse was not severe enough (such as broken bones or sexual abuse). She still did not have separate housing. She denied that Hull had offered free tribal housing.
¶ 12 Upon questioning by H.J.'s lawyer, Mother agreed that it was her choice not to do what was required to get her child out of foster care. When asked why Uncle was still in the home, she responded: "Because he's still in the home with us." She knew that if Uncle moved, she would not be required to find a place of her own. She remembered telling the Department of Human Services that she was afraid of Uncle, that he was depressed since he lost his job, and that he had a drinking problem. She conceded that it was her fault that H.J. was not back in the home at the time of trial.
¶ 13 On cross-examination, Mother's lawyer asked about the family therapy. Grandmother and Uncle complied with DHS's wishes to join. Mother thought H.J. benefitted from the sessions because she had some problems about embellishing and exaggerating stories, as well as not telling the truth. Mother recounted the pizza story, but minimized the violence. With respect to tribal housing, she claimed it was not free, but a loan. She was unable to have one-on-one therapy with H.J. because her daughter's bad behavior meant she never stayed in any particular foster placement long enough to have a stable placement.
¶ 14 Rebecca Hull, a CAPS Unit Worker with the Cherokee Nation Indian Child Welfare Office also testified. Her job is to ensure that the purposes of ICWA are being met by providing active efforts at reunification. She stated she was a social worker and had previously testified as an expert in tribal child rearing and family practice. She is a member of the Cherokee Nation. The Court recognized her as an expert in the area of child rearing and customs in the Cherokee Nation. Hull testified that "[o]ur goal is to try to keep Indian families together and do all kinds of active efforts that we can to ensure that the Indian families stay together, if at all possible. The burden of proof on us is beyond a reasonable doubt."
¶ 15 Hull testified that she started with the Johnson family in June 2005. She had met all three adult members and supervised numerous lengthy home visits. She participated in staffings with DHS. She spoke with the therapists. She was familiar with Mother's ISP. With respect to housing, Hull offered Mother transportation, offered to help her with applications, and offered to write a letter of recommendation to the Housing Authority. She explained that there were four or five programs within the Cherokee Nation, including one to buy a house where the Nation helps with the closing costs. When Mother responded that she wanted an apartment, Hull told her that they had emergency housing, in very low-income apartments, for which she could probably get within two or three, weeks. However, Hull stated that Mother would not call to ask for transportation. Mother never provided Hull with any documentation of applications for any housing. Hull explained to Mother that her child was fearful of her home, but she said Mother minimized that and stated that she should not have to move from the home. When told that she would help her get a place from the Tulsa Housing Authority near public transportation, Mother did not respond.
¶ 16 After the unsupervised visit in which Uncle tapped the child's rear to break up the wrestling match and the child psychologically shut down, Hull called a staff meeting, including the family, and explained that it was now a therapeutic issue, not a question whether Uncle was an abuser. H.J. was in the bathroom and refused to come out. She did not feel safe with the family anymore. Hull no longer felt reunification was possible despite her very active efforts.
*1077 ¶ 17 Hull's conclusion was reviewed with twenty-five tribal workers. She had to show them by clear and convincing evidence that her efforts to try to reunify the family were unsuccessful and that the recommendation should be termination of parental rights. This staff review takes eight hours and each worker is allowed to give a recommendation. If there are still ideas to implement, her job is not finished and she must implement them. In this case, the Cherokee Nation was unanimous in its decision to support her recommendation of termination of parental rights. It was in the child's best interest to have a safe and stable environment. The child needed permanency and to not be afraid of her surroundings.
¶ 18 The jury returned a verdict terminating Mother's parental rights. The question whether the State and the Tribe put forth "active efforts" to rehabilitate and provide remedial services, however, was one for the court to consider. The record does not reveal any effort by Mother to bring her objection, with respect to the State's failure to prove "active efforts" beyond a reasonable doubt, to the Court's attention during trial.[3]

ACTIVE EFFORTS
¶ 19 As previously stated, § 1912(d) does not contain a burden of proof that would guide the trial court in its determination. The "active efforts" requirement applies to both foster placements, using a clear and convincing burden under § 1912(e), and termination cases, which requires proof beyond a reasonable doubt under § 1912(f). Thus, some courts apply the burden of proof applicable to the underlying proceeding. In the Matter of G.S., 2002 MT 245, 312 Mont. 108, 59 P.3d 1063, 1071. Also see Matter of Welfare of M.S.S., 465 N.W.2d 412 (Minn.App. 1991); People in Interest of S.R., 323 N.W.2d 885 (S.D.1982); Matter of Kreft, 148 Mich. App. 682, 384 N.W.2d 843 (1986); and In re L.N.W., 457 N.W.2d 17 (Iowa App.1990). The Montana Supreme Court used both the rationale expressed in the federal Indian Child Welfare Act, 25 U.S.C.A. § 1901 et seq., as well as a provision in the Montana Code expressly adopting the standards of proof required by ICWA, Section 41-3-422(5)(b), MCA.
¶ 20 Other states have taken a different approach. In In re Dependency of A.M., 22 P.3d 828, 106 Wash.App. 123 (2001), the court held that § 1912(d) did not require a higher degree of proof than the clear, cogent and convincing evidence required by Washington law. (RCW 13.34.180).[4]
¶ 21 The Supreme Court of Alaska utilized a preponderance of the evidence standard for the "active efforts" determination utilizing Alaska law. E.A. v. State of Alaska, 46 P.3d 986 (Alaska 2002). Also see K.N. v. State of Alaska, 856 P.2d 468 (Alaska 1993).
¶ 22 The Supreme Judicial Court of Maine suggested that the federal guidelines should be interpreted to change state law to the least extent possible, and held that the "active efforts" determination be governed by the clear and convincing evidence standard in termination cases. Part of the court's reasoning is that § 1912(f) is the only statute requiring proof beyond a reasonable doubt *1078 (in termination cases only). In re Annette P., 589 A.2d 924 (Maine 1991).
¶ 23 We start with the premise of § 1912(f) that in Indian Child Welfare cases, "termination of parental rights may not be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Proof beyond a reasonable doubt is only required in the final step of the termination process. In this case, this requirement was met by the jury's verdict, which is not challenged by Mother.
¶ 24 Prior steps in the process are not subject to the beyond a reasonable doubt burden. Decisions regarding removal of children from homes, deprived status, and foster care placement can all be considered "predicates" to termination but are not governed by the strictest burden of proof. See Welfare of M.S.S., supra, 465 N.W.2d at 418.
¶ 25 The "active efforts" requirement is a similar predicate, to be determined by the trial court, before the termination case may proceed. The state is required to make an affirmative showing, "to satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the break up of the Indian family and that those efforts have proved unsuccessful."
¶ 26 Our review of that finding will be governed by the equitable standard of review: whether it is against the clear weight of the evidence. Carpenter v. Carpenter, 1982 OK 38, 645 P.2d 476. Based on the evidence recited above, the trial court's decision to proceed with the termination proceeding was not against the clear weight of the evidence. The order sustaining State's Motion to Terminate Parental Rights upon a Jury Verdict is AFFIRMED.
ADAMS, J., concurs in result, and MITCHELL, P.J., concurs.
NOTES
[1] In Oklahoma, pursuant to the Oklahoma Children's Code, 10 O.S.2001 § 7001-1.1 et seq., the standard of family reunification is "reasonable efforts." For instance, when the court reviews the disposition order, it makes a determination whether ". . . reasonable efforts have been made to provide for the safe return of the child to the child's own home." 10 O.S.2001 § 7003-5.6.(F)(2)(a).
[2] The ISP had other components, such as maintaining employment and paying child support. Mother fulfilled these requirements.
[3] The Oklahoma Supreme Court Committee notes with respect to "active efforts," in In re Oklahoma Uniform Jury Instructions for Juvenile Cases, Ch. 5, "Indian Child Welfare Act," 2005 OK 12, 116 P.3d 119, states: "Section 1912(d), supra, requires in any proceeding to effect foster care placement or termination of parental rights to an Indian child, a showing that `active efforts' have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proven unsuccessful. The Committee has concluded that whether this requirement has been satisfied is an issue for the judge, rather than the jury. The trial judge will have familiarity with the various remedial services and rehabilitative programs that are available, and therefore, the trial judge is in a position to determine whether active efforts to provide them have been made before allowing a case to be presented to the jury. Accordingly, this Chapter does not include a jury instruction on this issue. The judge's determination with respect to active efforts should be made by the trial court prior to or simultaneously with a proceeding for adjudication of deprived status or termination of parental rights. There is no precise definition for what constitutes `active efforts,' and it should be determined by the court on a case by case basis."
[4] The court in In re Charles, 70 Or.App. 10, 688 P.2d 1354 (1984) found that the purpose of § 1912(d) was to require an affirmative showing by the state that active efforts to reunite the family had failed.