No. 98-456

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 128



IN THE MATTER OF K.H. AND K.L.E.,
Youths in Need of Care.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Yellowstone,
The Honorable Maurice R. Colberg, Jr., Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Jill Deann LaRance, LaRance Law Firm, Inc., Billings, Montana

For Respondent:

Hon. Joseph P. Mazurek, Attorney General; Mark W. Mattioli,
Assistant Attorney General, Helena, Montana

Dennis Paxinos, Yellowstone County Attorney; Melanie Logan,
Deputy Yellowstone County Attorney, Billings, Montana

Guardian Ad Litem for K.H.:

Damon L. Gannett, Gannett Law Firm, Billings, Montana

Submitted on Briefs: March 18, 1999

Decided:   June 3, 1999

Filed:

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 T.L.E., a Crow Indian and the natural mother of the children, appeals from the order of the Thirteenth Judicial District Court, Yellowstone County, terminating her parental rights to her son, K.H., pursuant to the Indian Child Welfare Act of 1978 (ICWA) and the Montana Code.[1] We reverse.

¶2 The dispositive issue on appeal is whether the District Court erred under ICWA by terminating T.L.E.'s parental rights to K.H. without the required testimony of a qualified expert witness.

Factual and Procedural Background

¶3 On September 2, 1995, K.H., a boy, was born to T.L.E. In September of 1996, shortly after K.L.E. was born, the Montana Department of Public Health and Human Services (the Department) petitioned for temporary investigative authority over T.L.E.'s children. The petition was brought due to concerns regarding T.L.E.'s chronic use of illicit drugs and alcohol, including the use of such substances while she was pregnant with her children.

---

[1] The State of Montana petitioned for the termination of T.L.E.'s parental rights to both of her children, K.L.E. and K.H. Because ICWA governs Indian child custody proceedings, the children's tribe, the Crow Tribe, received notice of the proposed termination actions and petitioned to intervene and remove both actions to tribal court jurisdiction. *See* 25 U.S.C. § 1911(b) (authorizing transfer of jurisdiction over Indian child custody proceedings to tribal court). K.L.E. has a different father than K.H., and K.L.E.'s petition was removed to tribal court jurisdiction without objection from her natural father. However, K.H.'s natural father is non-Indian and objected to the transfer of jurisdiction over his cause to the Crow Tribal Court. Thus, this appeal pertains only to K.H.'s state court termination proceeding.

2

T.L.E. did not object to the Department obtaining temporary investigative authority. The petition was granted and the children were placed in foster care. In October of 1996, T.L.E. entered into the first of several voluntary treatment plans with the Department. At the time, T.L.E. was told by the Department that continued drug and alcohol use could result in the termination of her parental rights.

¶4 However, T.L.E. relapsed into alcohol, marijuana, and cocaine use, and became depressed and suicidal. In an attempt to alleviate T.L.E.'s bouts of depression, the Department placed her in foster care with the children; however, she lasted less than twenty-four hours in this arrangement before leaving. In late October of 1996, T.L.E. was discharged from chemical dependency treatment due to a lack of attendance and substance abuse relapses. Upon relapsing, T.L.E. was filled with thoughts of suicide and was admitted for psychiatric treatment.[2]

¶5 In December of 1996, the Department petitioned for temporary custody of the children. Again, T.L.E. did not object. In January of 1997, T.L.E. was arrested for shoplifting and criminal sale of dangerous drugs; she received probation. That same month, she entered into another voluntary treatment plan, but failed to comply with its terms. T.L.E.

---

[2] T.L.E. has a number of demons from her past with which she continues to grapple. For example, at age seven, she watched her mother murder her father. It appears that she has received little, if any, emotional support from her mother over the years, and continues to have a rocky relationship with her mother. Furthermore, she claims to have been raped at age 12, and again at age 15. T.L.E., who is currently 25 years old, dropped out of school after the eighth grade and has been chemically dependent since age 16. She has never held down stable employment in her life, and has, at times, prostituted herself for drug money and to be able to provide financial support for her children.

3

subsequently entered into other treatment plans with the Department, but was repeatedly unsuccessful in controlling her addictions.

¶6 During her treatment, T.L.E. missed scheduled visits with her children, and later admitted that some of these absences were due to alcohol abuse. T.L.E. also arrived at a scheduled visitation in March of 1997 reeking of alcohol and claimed that it had been spilled upon her, but refused to submit to a breathalyzer test. In April of 1997, T.L.E. was evicted from her apartment and stated that she could not adequately care for both of her children. Indeed, a number of times T.L.E. offered to relinquish custody of the children because she could not adequately provide for them.

¶7 T.L.E. adamantly maintains that she has remained drug and alcohol free since June of 1997, when she was arrested for probation violations and sentenced to three years with the Department of Corrections (DOC). Pursuant to her probationary violations, the DOC initially placed T.L.E. in the Butte Prerelease Center. In July of 1997, the Department petitioned the court to extend temporary custody, citing T.L.E.'s failure to successfully comply with or complete any of her court-approved treatment plans. The extension of temporary custody was granted without objection from T.L.E. While in Butte, T.L.E. entered the Montana Chemical Dependency Center; she was discharged from the program in September of 1997 for lack of progress. In October of 1997, T.L.E. was transferred to the Montana Women's Prison in Billings for failure to comply with regulations at the Butte Prerelease Center. While incarcerated at the Women's Prison, T.L.E. has continued to

4

experience disciplinary problems and has been written up an average of once per month for various infractions of prison rules. T.L.E. has admitted missing several prison classes and meetings necessary to her treatment plans as a result of her inability to compose her emotions when she is not drinking or using illegal drugs on a regular basis.

¶8 At the same time, since being imprisoned, T.L.E. has demonstrated some progress towards meeting the goals of her treatment plans: she has addressed her chemical dependency issues by attending classes, including the successful completion of a drug and alcohol education program consisting of instruction in the roots of addiction, personal values, alternatives to drug-induced highs, methods of enhancing self-respect, relationship skills, and coping with life after incarceration; she has also been attending alcoholics anonymous; she successfully completed a class in coping with anxiety and depression and has continued to work on her depression issues; she has attended positive parenting classes; she has participated in additional programs involving relationships with men, criminal thinking, skills building, grief group, and moral recognition therapy; and she is close to completing her GED.

¶9 In October of 1997, K.H. was placed in his father's custody. In December of 1997, the Department petitioned for permanent custody and termination of T.L.E.'s parental rights, citing general noncompliance with her treatment plans.[3] After a hearing on the Department's

---

[3]　In all, T.L.E. entered into four separate treatment plans with the Department, spanning from October 8, 1996, through March 11, 1998.

termination petition, the District Court terminated T.L.E.'s parental rights to K.H. T.L.E. appeals.

## Discussion

¶10 Did the District Court err under ICWA by ordering termination of T.L.E.'s parental rights to K.H. without the required testimony of a qualified expert witness?

¶11 Determining the qualifications of an expert witness is a matter within a trial court's discretion, and this Court will not overturn such determinations in the absence of an abuse of that discretion. In the Matter of the Adoption of H.M.O., 1998 MT 175, ¶ 20, 289 Mont. 509, ¶ 20, 962 P.2d 1191, ¶ 20.

¶12 T.L.E. argues that the Department failed to qualify an appropriate expert witness with credentials beyond that of a normal social worker and, therefore, that the District Court erred in finding beyond a reasonable doubt that her parental rights should be terminated pursuant to ICWA. The Department contends, in response, that T.L.E. has "waived" this claim on appeal by failing to object at the termination hearing to the Department's introduction of its witness, social worker Lori Hicks (Hicks), as an appropriately qualified ICWA expert.

¶13 ICWA provides in relevant part:

> No termination of parental rights may be ordered in such proceeding in the absence of a <u>determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses</u>, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child. [Emphasis added.]

6

25 U.S.C. § 1912(f). Thus, we must determine, as a threshold matter, whether this Court should reach the merits of T.L.E.'s challenge to the Department's reliance on Hicks as a qualified expert witness for purposes of terminating Indian parental rights pursuant to ICWA.

¶14 T.L.E. relies upon this Court's recent decision in *Matter of H.M.O.*, where, after noting that qualified expert testimony is a "prerequisite" to the termination of parental rights under ICWA, this Court held that "a social worker must possess <u>expertise beyond that of the normal social worker</u> to satisfy the qualified expert witness requirement of 25 U.S.C. § 1912(f)." *Matter of H.M.O.*, ¶¶ 26, 33 (emphasis added). We generally decline to address an issue raised for the first time on appeal where the litigant had an opportunity to object at trial; however, there is a limited exception which permits this Court to reach the merits of an issue, in the absence of a timely objection, when the party did not have an adequate opportunity to object at the trial level. *See* Cenex v. Board of Comm'rs for Yellowstone County (1997), 283 Mont. 330, 337-38, 941 P.2d 964, 968. In *Matter of H.M.O.*, this Court invoked that limited exception and took cognizance of the appellant's challenge to the State's witnesses as qualified ICWA experts, despite a failure to object to those witnesses at the trial level. *See Matter of H.M.O.*, ¶ 25.

¶15 The Department contends that *Matter of H.M.O.* is distinguishable, however. The appellant in that case never had an adequate opportunity to object to the State's expert witnesses because the "testimony" at issue was contained in written reports received into evidence; no foundation was therefore established for the admission of the expert testimony.

7

In contrast, T.L.E. was represented by counsel at her termination hearing, but never objected to the adequacy of the foundation established by the Department for the presentation of Hicks' expert testimony--including Hicks' opinion, pursuant to § 1912(f) of ICWA, that K.H. was seriously endangered by a continuation of the parental relationship with T.L.E. Nor did T.L.E. choose to *voir dire* Hicks regarding her qualifications as an appropriate ICWA expert. According to the Department, this Court should therefore decline to invoke the limited exception recognized in *Matter of H.M.O.* and refuse to reach the merits of T.L.E.'s claim.

¶16 Contrary to the Department's position, we do not find *Matter of H.M.O.* distinguishable from the facts of this case. For the reasons set forth below, we conclude that T.L.E. did not have an adequate opportunity to object to the District Court's implied reliance on Hicks as an ICWA expert witness in terminating T.L.E.'s parental rights. Therefore, despite T.L.E.'s failure to object to Hicks as an appropriately qualified ICWA expert, the question of whether Hicks was so qualified is properly before this Court.

¶17 In *Matter of H.M.O.*, the "first notice" that certain witnesses "were to be treated as experts for ICWA purposes was when the District Court entered its findings of fact, conclusions of law, and order." *Matter of H.M.O.*, ¶ 24. This peculiar situation arose because the State's experts did not testify in person at the termination hearing; rather, the State introduced written reports and deposition testimony, but failed to ever disclose to the natural Indian mother that the witnesses were being offered and qualified as ICWA "experts." *See Matter of H.M.O.*, ¶¶ 27-28. Thus, this Court chose to entertain the mother's claim

8

because she "did not have an adequate opportunity to object to the District Court's reliance on" the witnesses as qualified experts pursuant to § 1912(f) of ICWA. *Matter of H.M.O.*, ¶ 25.

¶18    We reach the same result here. Nowhere in the transcript of the termination hearing is there any indication that the Department ever expressly offered--let alone qualified--Hicks' testimony as that of an ICWA "expert." Nor did the District Court ever expressly rule on Hicks' qualifications as an ICWA expert during that proceeding. Thus, as in *Matter of H.M.O.*, T.L.E. was not put on "notice" that the Department was intending that Hicks' testimony satisfy its burden of proof under § 1912(f) of ICWA until the District Court returned its order, relying by inference upon Hicks' testimony as that of a qualified ICWA expert in terminating T.L.E.'s parental rights to K.H.

¶19    We refuse to endorse the unreasonable notion, implicit in the Department's position on appeal, that T.L.E. was under an obligation to object to each and every witness offered by the Department if she wished to preclude a witness from being deemed, after the fact, an ICWA expert. The burden under ICWA is not upon T.L.E. to preclude such expert testimony, but on the Department to produce it: an essential "prerequisite" to the termination of Indian parental rights under § 1912(f) of ICWA is the testimony of a qualified expert that a continuation of the parental relationship would likely result in serious emotional or physical damage to the Indian child in question. *Matter of H.M.O.*, ¶ 26. However, as we suggested in *Matter of H.M.O.*, "information set forth in a vacuum--that is, without any disclosure that

9

the witness is being offered and qualified as an expert"--is neither sufficient to put the Indian natural parent on notice that the witness is being put forward as an ICWA expert, nor to establish an adequate foundation for the admission of such expert testimony. *See Matter of H.M.O.*, ¶ 28.

¶20 Our interpretation of *Matter of H.M.O.* so as to reach the merits of T.L.E.'s claim in this case is, in our view, both "congruent with the remedial character of [ICWA]" and consistent with "our responsibility to promote and protect the unique Indian cultures of our state for future generations of Montanans." In the Matter of M.E.M. (1981), 195 Mont. 329, 333-35, 635 P.2d 1313, 1316-17. The District Court, by terminating T.L.E.'s parental rights to K.H., severed a fundamental bond not only between mother and child, but also between culture and individual. The very use of the "reasonable doubt" standard of proof in ICWA termination actions, the highest standard of proof known to American jurisprudence, was intended by Congress to stop the all-too-common removal of Indian children from their Indian families, and thus tribal culture, " 'by non-tribal government authorities who have no basis for intelligently evaluating the cultural and social premises underlying Indian home life and childrearing.' " Mississippi Band of Choctaw Indians v. Holyfield (1989), 490 U.S. 30, 34-35, 109 S.Ct. 1597, 1601, 104 L.Ed.2d 29, 38, *quoting* Hearings on S. 1214 Before the Subcommittee on Indian Affairs and Public Lands of the House Committee on Interior and Insular Affairs, 95th Cong. 191-92 (1978) (statement of Calvin Isaac, Tribal Chief of the Mississippi Band of Choctaw Indians).

10

¶21 We remain vigilant because, in large part, "the members of a tribe are its culture." *Matter of M.E.M.*, 195 Mont. at 333, 635 P.2d at 1316. As K.H.'s father is non-Indian, the child's connection to his Crow Indian culture will be maintained intact primarily through a continuing relationship with his Indian mother, T.L.E. While we express no opinion as to whether T.L.E. deserves a continuation of her parental rights to K.H., we conclude, in light of the curative function of ICWA, that her challenge to the Department's expert witness, Hicks, is properly before us.

¶22 Under Montana law, a witness may be "qualified as an expert by knowledge, skill, experience, training, or education," and when so qualified, "may testify thereto in the form of an opinion or otherwise." Rule 702, M.R.Evid. Before such expert evidence can be admitted, however, " 'some foundation must be laid to show that the expert has special training or education and adequate knowledge on which to base an opinion.' " *Matter of H.M.O.*, ¶ 26, *quoting* Cottrell v. Burlington Northern R. Co. (1993), 261 Mont. 296, 301, 863 P.2d 381, 384.

¶23 Furthermore, in determining whether a proper foundation has been laid for the admission of a qualified expert opinion in an ICWA termination proceeding, the Guidelines for State Courts; Indian Child Custody Proceedings (the Guidelines), promulgated by the United States Department of the Interior, Bureau of Indian Affairs (BIA) additionally provide:

"D.4. Qualified Expert Witnesses

11

(a) Removal of an Indian child from his or her family must be based on competent testimony from one or more experts qualified to speak specifically to the issue of whether continued custody by the parents or Indian custodian is likely to result in serious physical or emotional damage to the child.

(b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:

(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childbearing practices.

(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childbearing practices within the Indian child's tribe.

(iii) A professional person having substantial education and experience in the area of his or her specialty."

*Matter of H.M.O.*, ¶ 30, *quoting* 44 Fed. Reg. 67, 584, 67, 593 (1979) (not codified). While the Guidelines are not binding on state courts and admittedly "add a dimension to expert testimony not normally required" under Montana law, we have deemed them applicable in the courts of this state because the Guidelines "comport with the spirit of [ICWA]." *Matter of M.E.M.*, 195 Mont. at 337, 635 P.2d at 1318.

¶24    T.L.E. effectively argues that since the Department could not have qualified social worker Hicks under subparts (i) or (ii) of the Guidelines, Hicks could be qualified as an expert for purposes of ICWA--if at all--only under subpart (iii). *See Matter of H.M.O.*, ¶ 31. In turn, T.L.E. asserts that Hicks could not qualify as an expert under the third subpart of the Guidelines because, as in *Matter of H.M.O.*, she does not possess any qualifications beyond that of a normal social worker. We agree.

12

¶25 The first two subparts of the Guidelines instruct state courts that a qualified ICWA expert should be "knowledgeable in tribal customs as they pertain to family organization and childbearing practices" (first subpart); or should have "extensive knowledge of prevailing social and cultural standards and childbearing practices within the Indian child's tribe" (second subpart). In our opinion, these references to tribal customs, cultural standards, and tribal childbearing practices found in the first two subparts of the Guidelines help to define who can be considered a qualified ICWA expert under the third subpart.

¶26 In keeping with this notion, enlightened state courts have gone beyond the plain language of subpart three of the Guidelines--appropriately, in our view--and have concluded that experts should possess more than simply substantial education and experience in the area of their specialty. Rather, they should have _expertise in, and substantial knowledge of, Native American families and their childrearing practices_. *See, e.g.,* In the Matter of the Welfare of M.S.S. (Minn. App. 1991), 465 N.W.2d 412, 417 ("The experts should also be conversant with Indian culture and child-rearing practices, lest 'the problems Congress has tried to remedy may remain despite the adoption of [ICWA].' ") (citation omitted); State ex rel. Juv. Dep't v. Charles (Or. App. 1984), 688 P.2d 1354, 1359-60 n.3 ("[A]n expert witness within the meaning of [ICWA] must possess special knowledge of social and cultural aspects of Indian life.").

¶27 Such an approach is consistent with the remedial purpose of ICWA. As the Commentary to the BIA Guidelines regulations explains:

13

[K]nowledge of tribal culture and childrearing practices will frequently be very valuable to the court. Determining the likelihood of future harm frequently involves predicting future behavior--which is influenced to a large degree by culture. Specific behavior patterns will often need to be placed in the context of the total culture to determine whether they are likely to cause serious emotional harm.

44 Fed. Reg. at 67,593. Indeed, the very adoption of ICWA by Congress was predicated upon an express recognition of the cultural differences between Anglo and Indian notions of the family (e.g., the nuclear family versus the extended family),[4] and the ways in which this cultural disjunction had often resulted in "an alarmingly high percentage of Indian families [being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies . . . ." 25 U.S.C. § 1901(4).

¶28     Although we do not hold that an expert ICWA witness qualified under subpart three of the Guidelines must be fluent in the cultural standards of a particular Indian tribe, we conclude that it is highly preferable that any expert witness qualified for purposes of ICWA-- particularly a non-Indian expert witness--possess significant knowledge of and experience

---

[4] According to the authors of an oft-quoted law review article:
An Indian's extended family includes not only grandparents, and aunts and uncles, but often distant relatives who, by custom, tradition, or necessity have definite responsibilities and duties in child rearing. Although the nuclear family is the generally accepted standard of a basic family unit, the nuclear family concept is frequently inapplicable to Indians. Yet it is the nuclear family standard by which many state courts determine that Indian children are neglected. This built-in bias against Indian child rearing practices is further compounded by state laws . . . that frequently make it easy to remove Indian children.
Jesse C. Trentadue & Myra A. DeMontigny, *The Indian Child Welfare Act of 1978: A Petitioner's Perspective*, 62 N.D. L. Rev. 487, 498 (1986) (footnotes omitted).

14

with Indian culture, family structure, and childrearing practices in general. Whether a proffered expert ICWA witness has been sufficiently qualified as an "expert" remains a matter within the discretion of a district court. Nonetheless, we urge trial courts to ensure that a proper foundation has been established showing such Indian cultural qualifications prior to admitting the testimony of a witness as a qualified ICWA expert.

¶29 As in *Matter of H.M.O.*, the Department laid an inadequate foundation in this case for the admittance of Hicks' testimony as a qualified ICWA expert. At the termination hearing, the Department established only the following foundation for the admission of Hicks' so-called "expert" opinion:

> Q: Can you briefly describe your education and experience[?]
> A: I have a Bachelor of Science in education health and human development from Montana State University. I have almost completed halfway--completed a degree in community counseling, a master's degree here in Billings.
> Q: Do you have contact with Native American people on a regular basis?
> A: Yes.
> Q: You have contact with numerous children on a regular basis; is that correct?
> A: Yes, daily.
> Q: Are you familiar with the needs of children and minimally acceptable parenting skills needed to meet those needs?
> A: Yes.

Where, as here, an ICWA termination proceeding takes place in state court, rather than a tribal forum, it behooves us to take great pains to ensure that the prerequisites of ICWA have been satisfied. We are not confident that ICWA's requirements have been satisfied here. Hicks testified that she has contact on a "regular basis" with Native American people, but

there is no indication that she possesses any special knowledge with respect to Indian culture or childrearing practices. Just because a social worker interacts with Indians, even on a regular basis, it does not necessarily follow that he or she qualifies as an Indian child welfare expert.

¶30　This Court has previously acknowledged that " '[t]he separation of Indian children from their families frequently occurs in situations where . . . the agency officials involved are unfamiliar with, and often disdainful of Indian culture and society . . . .' " *Matter of M.E.M.*, 195 Mont. at 334, 635 P.2d at 1316-17, *quoting* S. Rep. No. 95-597 (1977). While we do not suggest that Hicks' testimony reveals any disdain for an Indian way of life, it is possible that ignorance of Indian culture and society played an undetermined role in her expressed opinions.[5] Given the fundamental liberty interest at stake in a termination proceeding and the unique role of state courts in carrying out the federal purposes of ICWA, there is all the more reason for proceeding with caution in such cases.

¶31　We hold that the Department failed to sustain its heavy burden of producing "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses," showing that T.L.E.'s parental rights should be terminated under ICWA. 25 U.S.C. § 1912(f). The District Court therefore abused its discretion in implicitly concluding that an adequate foundation had

---

[5] To illustrate, portions of both Hicks' testimony as well as the District Court's order appear to express the view that T.L.E.'s attempts to arrange for the adoption of K.H. by her sister is indicative of a desire by T.L.E. "to relinquish" her parental rights. This prognosis, while entirely consistent with Anglo notions of the nuclear family, could be an unfortunate misinterpretation of a not uncommon behavioral response by an Indian parent in a traditional culture which embraces child rearing within an extended family structure.

16

been established for the admission of Hicks' testimony as that of an appropriately qualified ICWA expert. Accordingly, we reverse the District Court's termination of T.L.E.'s parental rights to K.H. pursuant to ICWA, and remand this matter for further proceedings consistent with this opinion. Since we have concluded that the Department failed to sustain its weightier burden of proof under ICWA, we need not reach the question of whether the Department sustained its burden for terminating parental rights under the Montana Code.

¶32    Reversed and remanded.

_W. William Leaphart_
Justice

We concur:

_J. A. Turnage_
Chief Justice

_Karla M. Gray_

_William E. Hunt_

_Jim Regnier_

_Terry Trieweiler_

_____
Justices

17