2005 SD 4
THE PEOPLE OF THE STATE OF SOUTH DAKOTA IN THE INTEREST OF M.H., L.U.H., W.H., JR., L.S.H., AND T.H., MINOR CHILDREN, CONCERNING
T.R.T., W.H., SR., AND M.M., Respondents.
Nos. 23092, 23093
Supreme Court of South Dakota.
Considered on Briefs on August 23, 2004
Opinion Filed January 5, 2005
JASON ADAMS of Office of the Minnehaha Co., Public Defender, Sioux Falls, South Dakota, Attorney for appellant, Mother, T.R.T.
JULIE HOFER of Hofer Law Office, Sioux Falls, South Dakota, Attorneys for appellant, Father, W.H., Sr.
TARA L. GLASFORD of Abourezk Law Offices, Sioux Falls, South Dakota, Attorneys for appellee, minor children.
LAWRENCE E. LONG, Attorney General, DAVID W. SIEBRASSE, Assistant Attorney General, Pierre, South Dakota, Attorneys for appellee, State of South Dakota.
THOMAS J. VAN NORMAN, Senior Tribal Attorney, Cheyenne River Sioux Tribe, Eagle Butte SD 57625, Attorney for appellee, Cheyenne River Sioux Tribe.
GILBERTSON, Chief Justice.
[¶ 1.] In this consolidated appeal, mother, father and the Cheyenne River Sioux Tribe (CRST)[1] appeal a judgment terminating parental rights arguing the provisions of the Indian Child Welfare Act (ICWA) were not followed in the proceeding below. We reverse and remand.

FACTS
[¶ 2.] On July 10, 2002, a petition was filed by the State of South Dakota alleging M.H. (born July 16, 1993), W.H. Jr. (born June 15, 1994), L.H. (born July 31, 1995), L.H. (born March 8, 1999) and T.H. (born July 14, 2001) were abused and neglected children. T.R.T. (mother) is the maternal parent of these children. W.H., Sr. (father) is the paternal parent of L.H., L.H., M.H. and W.H. Jr. T.H.'s paternal parent did not appear in this matter and is not a party to this appeal. These children are Native American children and ICWA is applicable in this case. After receiving notification of this matter, as required by the ICWA, CRST intervened and participated in the hearings below.
[¶ 3.] The impetus for this action occurred on June 14, 2002, when law enforcement was dispatched to the parents' home for a domestic dispute. Law enforcement discovered father extremely intoxicated and disoriented. Mother and two other adult males were also present and intoxicated. The children were extremely dirty and one child had a soiled diaper with fecal matter over his body. The youngest child was on a table amidst open and empty beer cans, cigarette butts and raw meat. W.H., Jr. was eating a raw bratwurst. The entire home was filthy. There were beer cans strewn about the apartment, a broken mirror on the kitchen counter and soiled diapers on the floor.
[¶ 4.] This was not the first allegation of inappropriate parenting of these children. M.H. had previously been placed in protective custody when he received skull fractures and the parents gave conflicting stories as to the cause of the injuries. W.H., Jr. suffered a broken leg in August of 1996 and the Department of Social Services (DSS) became involved in monitoring the family. There were also missed medical appointments relating to W.H. Jr. that resulted in referrals to DSS. In December 1997, the children were placed in the custody of DSS when mother was in jail and father was intoxicated while caring for the children. In May 1999, the children were found unsupervised while the parents were intoxicated. In December 2000, mother was arrested for assaulting father.
[¶ 5.] Mother and father stipulated that the children were abused and neglected. Mother signed a case service plan with DSS to address her parenting deficiencies. Mother agreed to complete a chemical dependency evaluation, however, it took her six months to eventually complete the evaluation and she did not follow through with the recommendations made by the evaluator. In fact, mother continued to have problems with alcohol abuse during these proceedings and did not complete an alcohol treatment program as recommended. Though mother eventually completed parenting classes it took her six months to do so. Moreover, mother did not find adequate housing, did not complete anger management classes, failed to attend domestic violence support groups and continued to be a victim of domestic violence. There were also concerns regarding mother's mental condition as she reported being depressed and suicidal.
[¶ 6.] Father also entered into a case service plan with DSS to improve his parenting skills. He completed outpatient alcohol treatment; however, he did not complete his aftercare or faithfully attend AA. Father failed to remain sober during the course of this proceeding. Despite having completed anger management classes, father continued to become involved in domestic abuse situations including an arrest for intentional damage to property and various other encounters with mother.
[¶ 7.] When the children were placed in foster care they had major dental problems, recurring problems with lice and M.H. and L.H. were academically behind. The testimony at trial indicated that the children thrived in foster care, had become more outgoing and were being exposed to their Native American culture. W.H. Jr. and L.H. were in Children's Care Hospital due to their individualized needs. W.H., Jr. is diaper dependent and wears a helmet because of an unsteady gait. L.H. had recent heart surgery.
[¶ 8.] The trial court found that although reasonable and active efforts had been made to reunite the family termination was in the best interests of the children and supported by evidence beyond a reasonable doubt, including expert testimony, that continued custody would likely result in serious emotional or physical damage to the children.

ANALYSIS

ISSUE
[¶ 9.] Whether the trial court abused its discretion in determining qualified expert testimony as mandated by ICWA was presented prior to ordering termination of parental rights.
[¶ AUTONUM 10.] ICWA provides:
No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses,[2] that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.
25 USC § 1912(f) (emphasis added). However, ICWA does not define "qualified expert witness." See id. Rather, we have recognized that the BIA has issued guidelines to aid in the determination of a "qualified expert witness" within the meaning of the act; though those guidelines do not have binding legislative effect and have never been formally adopted by this Court.[3] In the Matter of S.D., K.C.H., and L.W., 402 NW2d 346, 349 (SD 1987) (citing Guidelines for State Courts 44 FedReg 67,584 at 67,593 (November 26, 1979)). Those guidelines indicate:
(a) Removal of an Indian child from his or her family must be based on competent testimony from one or more experts qualified to speak specifically to the issue of whether continued custody by the parents or Indian custodian is likely to result in serious physical or emotional damage to the child.
(b) Persons with the following characteristics are most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:
(i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.
(ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.
(iii) A professional person having substantial education and experience in the area of his or her specialty. 44 FedReg 67,584 at 67,593. Comparatively,
We do have firm guidance as to whom shall be expert witnesses in South Dakota: A witness is an expert witness and is qualified to give expert testimony if the judge finds that to perceive, know or understand the matter concerning which the witness is to testify, requires special knowledge, skill, experience or training and that the witness has the requisite special knowledge, skill, experience or training. The qualifications and competency of a witness to give opinion evidence is primarily in the discretion of the trial court and his ruling in determining qualifications will not be disturbed unless there is no evidence that the witness had the qualifications of an expert or the trial court has proceeded upon erroneous legal standards.
Matter of K.A.B.E and K.B.E., 325 NW2d 840, 843-44 (SD 1982). Consequently, the BIA guidelines help inform the court as to when the witness offered as an ICWA expert has "the requisite special knowledge, skill, experience or training" to assist the trial court. See id.
[¶ 11.] "This testimony is to provide the court with knowledge of the social and cultural aspects of Indian life to diminish the risk of any cultural bias." In re L.N.W., 457 NW2d 17, 18 (IowaApp 1990). "The references to tribal customs, cultural standards, and tribal childrearing practices found in the first two subparts of the Guidelines help to define who can be considered a qualified ICWA expert under the third subpart." Matter of K.H. and K.L.E., 981 P2d 1190, 1196 (Mont. 1999).[4] "One of the problems the ICWA sought to correct was the failure of welfare workers to understand Indian culture and practices concerning the raising of children." In re D.S., 577 NE2d 572, 576 (Ind 1991) (reversing for failure of trial court to inquire into expert witnesses' qualifications relating to placement of Native American Indian children). "[E]xperts should possess more than simply substantial education and experience in the area of their specialty. Rather, they should have expertise in, and substantial knowledge of, Native American families and their childrearing practices." Matter of K.H. and K.L.E., 981 P2d at 1193. Such testimony is a "prerequisite" to the termination of parental rights under ICWA. Id.
[¶ 12.] To fulfill this requirement the State offered the testimony of James Eirinberg as its sole ICWA expert. Eirinberg was an attorney-at-law licensed in the State of South Dakota. Eirinberg worked for the Yankton Sioux Tribe from 1989 until 1997 as a tribal prosecutor or tribal defender. He dealt mostly with criminal cases though he also encountered some abuse and neglect cases in his work. Eirinberg also worked for the Ponca Tribe in Nebraska for three years as a tribal prosecutor for abuse and neglect cases. He doubled as the ICWA director for the tribe during that time. He worked for the Flandreau Santee Sioux Tribe as a special prosecutor for less than a year.
[¶ 13.] Both parents and the CRST objected to Eirinberg's qualifications to render an opinion on whether returning these children to their parents would likely result in serious emotional or physical damage to the children as required by ICWA. The State maintains that Eirinberg is "a professional person having substantial education and experience in the area of his or her specialty" within the meaning of the BIA guidelines. However, the record in this matter indicates that while Eirinberg had substantial experience dealing with other Native American Tribes, particularly the Yankton Sioux, his contacts and knowledge of the CRST were extremely limited. In this regard, the record reveals the following:
§ He had visited the CRST reservation on one occasion.
§ He was only aware of parental services offered by the Yankton Sioux or Ponca Tribes (neither involved in this proceeding).
§ He was unable to articulate the cultural or religious differences between the tribes he worked with and the CRST.
§ He was not able to identify the Lakota kinship structure or who was primarily responsible for raising the children in that structure.
§ He was unable to identify any services offered by the CRST
It is clear that Eirinberg's testimony was wholly lacking any specifics concerning the CRST's unique culture or the available tribal services to address the needs of these parents and children.[5]
[¶ 14.] The focus of ICWA is not a generic reference to all Indian tribe's in general. Congress established ICWA to not only protect the interests of Indian children but also to avoid a considerable weakening of "the tribe's ability to assert its interest in its children." Mississippi Bank of Choctaw Indians v. Holyfield, 490 US 30, 52 (1989) (citing In re Adoption of Halloway, 732 P2d 962, 969-970 (Utah 1986)) (emphasis added). "The ICWA thus, in the words of the House Report accompanying it, `seeks to protect the rights of the Indian child as an Indian and the rights of the Indian community and tribe in retaining its children in its society.'" Id. at 37. (emphasis added). This is because:
The protection of this tribal interest is at the core of the ICWA, which recognizes that the tribe has an interest in the child which is distinct from but on a parity with the interest of the parents. This relationship between Indian tribes and Indian children domiciled on the reservation finds no parallel in other ethnic cultures found in the United States.
Id. at 52 (quoting In re Adoption of Holloway, 732 P2d at 969-70).[6]
[¶ 15.] An expert's testimony is no more reliable than its foundation. See Interest of T.A., 2003 SD 56, ¶ 26, 663 NW2d 225, 234. It proves nothing without a supportive factual basis. It may prove little if only partially supported by a factual basis. Lien v. Class, 1998 SD 7, ¶ 23 n 12, 574 NW2d 601, 610 n 12 (citing Bridge v. Karl's Inc., 538 NW2d 521, 525 (SD 1995)). Given the lack of this necessary foundation, the trial court abused its discretion in determining Eirinberg was a qualified expert witness under the ICWA.[7]
[¶ 16.] The necessity of requiring compliance with the terms of ICWA is reflected in its purpose, to protect the tribal interest in its children, therefore, we must "remain vigilant because, in large part, the members of the tribe are its culture." Matter of K.H. and K.L.E., 981 P2d at 1195. This is in accord with the general legal doctrine that each tribe needs "to control their own internal relations, and . . . preserve their own unique customs and social order." Duro v. Reina, 495 US 676, 685-86 (1990)(overruled by legislative enactment). As the Montana Supreme Court aptly observed, this is "consistent with our responsibility to promote and protect the unique Indian cultures of our state for future generations." Matter of K.H. and K.L.E., 981 P2d at 1195. In the absence of qualified expert testimony supporting termination in the proceeding below the judgment of the trial court must be reversed and this matter remanded to the trial court.
[¶ 17.] Reversed and remanded.
[¶ 18.] GORS, Circuit Judge, for MEIERHENRY, Justice, disqualified.
[¶ 19.] KONENKAMP, Justice, and GORS, Circuit Judge, concur.
[¶ 20.] SABERS, Justice, concurs in result.
[¶ 21.] ZINTER, Justice, dissents.
SABERS, Justice (concurring in result).
[¶ 22.] I concur in result only because the proposed expert admitted that he was not an expert as to the social and cultural standards and child rearing practices within the "Sioux culture."
[¶ 23.] I submit his substantial expertise on Indian social, cultural and child rearing practices of Native Americans generally is more than adequate to qualify as an expert in this case under these facts.
[¶ 24.] A review of the facts set forth in the majority opinion makes it clear that continued custody of these children by these parents would be likely to result in both serious emotional and physical damage:
Law enforcement discovered father extremely intoxicated and disoriented. Mother and two other adult males were also present and intoxicated. The children were extremely dirty and one child had a soiled diaper with fecal matter over this body. The youngest child was on a table amidst open and empty beer cans, cigarette butts and raw meat. W.H., Jr. was eating a raw bratwurst. The entire home was filthy. There were beer cans strewn about the apartment, a broken mirror on the kitchen counter and soiled diapers on the floor.
This was not the first allegation of inappropriate parenting of these children. M.H. had previously been placed in protective custody when he received skull fractures and the parents gave conflicting stories as to the cause of the injuries. W.H., Jr. suffered a broken leg in August of 1996 and the Department of Social Services (DSS) became involved in monitoring the family. There were also missed medical appointments relating to W.H., Jr. that resulted in referrals to DSS. In December 1997, the children were placed in the custody of DSS when mother was in jail and father was intoxicated while caring for the children. In May 1999, the children were found unsupervised while the parents were intoxicated. In December 2000, mother was arrested for assaulting father.
Mother and father stipulated that the children were abused and neglected.
Majority Opinion, ¶¶3-5.
[¶ AUTONUM 25.] This is child abuse and neglect and has more to do with intoxication than with any specific Native American or Sioux culture. Therefore, except for the admission of not being an expert within the Sioux culture, this case could have been affirmed.
ZINTER, Justice (dissenting).
[¶ 26.] The trial court, in exercising its gatekeeping function under SDCL 19-15-2 (Rule 702), heard substantial (and conflicting) evidence of Eirinberg's training and experience in Indian culture, community, and childrearing practices.[8] Much of that evidence is not set forth in the majority and concurring opinions of the Court. See, e.g., infra, ¶¶ 28-32, 35-36. Because the Court does not acknowledge this other evidence of Eirinberg's qualifications, because it does not consider all relevant cases, and because it fails to apply the abuse of discretion standard of review, I respectfully dissent.

Standard of Review
[¶ 27.] In determining the qualifications of a proposed ICWA expert, this Court is limited to the abuse of discretion standard of review. In re D.M., 2003 SD 49, ¶19, 661 NW2d 768, 773. See also, In re K.H., 981 P2d 1190, 1193 (Mont 1999). Under that standard, "[t]he qualifications and competency of a witness to give opinion evidence [on ICWA issues] is primarily in the discretion of the trial court and [the trial court's] ruling in determining qualifications will not be disturbed unless there is no evidence that the witness had the qualifications of an expert. . . ." In re K.A.B.E., 325 NW2d 840, 844 (SD 1982) (emphasis added) (citation omitted).

Evidence of Qualifications
[¶ 28.] There is substantial evidence, not mentioned in the Court's opinion that establishes Eirinberg's experience and knowledge of Indian culture, Indian family structure, and Indian childrearing practices. The record reflects that Eirinberg's knowledge was developed over approximately fourteen years of work with Indian people in the area of child abuse and the ICWA. He began that work, almost exclusively with Indian tribes, in 1989. From 1989 to 1997, he was employed by the Yankton Sioux Tribe as a prosecutor and defense attorney in abuse and neglect, family, and juvenile cases. In that employment alone, he worked with between one thousand and two thousand Indians on the Reservation.
[¶ 29.] Eirinberg then spent the next three years working for the Ponca Tribe as that Tribe's lawyer, representing abused and neglected children. He handled those cases in tribal and state court, intervening on behalf of the Tribe all over the country (sometimes making motions to transfer cases to tribal court). The trial court heard specific evidence that this employment required him to "review cases that came into the Tribe and work with various social workers for the Tribe to determine what was in the best interests of the Tribe and their children and represent their children in state courts when necessary." During this same period of time, he was also the Ponca Tribe's ICWA Specialist/Director, and he assisted in the preparation of that Tribe's abuse and neglect code.
[¶ 30.] Eirinberg's latest work experience included employment as a special prosecutor for the Flandreau Santee Sioux Tribe and as a lawyer for the Yankton Sioux Tribe on ICWA matters. He continues to represent Indian clients on the Yankton Sioux Reservation, and he was working for the Winnebago Tribe at the time of trial.
[¶ 31.] Eirinberg's work experience on Reservations allowed him to study Indian culture, and he testified that he was actually in over one hundred homes interacting with tribal members. As a result, he testified that he knew about "Sioux culture" from his work with the Ponca Tribe and the Yankton Sioux Tribe. Most critical to this case, he provided unrefuted testimony that there were no substantial differences in childrearing practices among the relevant tribes, including the Cheyenne River Sioux Tribe.
[¶ 32.] The record also reflects that Eirinberg had specialized training on the ICWA. He testified that he had read well over one hundred law review articles in this area, had attended numerous ICWA training courses, was a member of the National Indian Child Welfare Association, and had recently completed that Association's course on the ICWA. Eirinberg further indicated that he had previously qualified as an expert in Minnehaha and Lincoln Counties, and he had been recognized as both an expert on ICWA "and as a qualified expert witness at the dispositional phase" of ICWA proceedings.
[¶ 33.] Considering this evidence, the trial court found that Eirinberg had "substantial education and experience in this specialty and that's regarding [the] Indian Child Welfare Act and also the culture and termination of Indian children and their parental rights. . . ." I agree. In fact, in my view, the state's showing is a textbook example of the qualification of an expert witness, and it certainly satisfies the some evidence abuse of discretion standard of review required by K.A.B.E. Id.

Relevant Caselaw
[¶ 34.] This Court reverses the trial court, concluding that an ICWA expert must have "specifics concerning the CRST's unique culture or the available tribal services. . . ." See supra ¶13. There are two problems with this conclusion. First, this type of objection regarding specifics goes to the weight of the expert's opinion rather than its admissibility. More importantly, a "specifics" standard is not required by the authorities cited by the Cheyenne River Sioux Tribe, Mother, and Father. In fact, the Cheyenne River Sioux Tribe's primary authority specifically rejects such a requirement:
Although we do not hold that an expert ICWA witness qualified under subpart three of the Guidelines must be fluent in the cultural standards of a particular Indian tribe, we conclude that it is highly preferable that any expert witness qualified for purposes of ICWAparticularly a non-Indian expert witness  possess significant knowledge of and experience with Indian culture, family structure, and childrearing practices in general.
K.H., 981 P2d at 1197.
[¶ 35.] It is also significant that even if we were to adopt the particular tribe requirement rejected in K.H., Eirinberg satisfied that requirement through his knowledge of the similarity of childrearing practices among all regional tribes. His particularized knowledge was established through his experience with the Yankton Sioux Tribe and by talking with other experts. From that experience, he was aware of the differences in culture, but the similarity of childrearing practices. More specifically, with respect to culture, Eirinberg indicated that he had "some insight, but . . . not the particular cultural practices of the Cheyenne River Sioux Tribe." However, he then explained, without contradiction, that the Yankton Sioux Tribe "is culturally, fairly culturally similar to the other eight Sioux tribes in South Dakota and North Dakota and I'm fairly familiar with their cultures." Thus, even under a "particular culture" requirement, there was some record evidence of similarity sufficient to satisfy the abuse of discretion standard of review.
[¶ 36.] More importantly, even if Eirinberg possessed no knowledge of cultural differences, an allegation not supported by the record, he unequivocally testified that he did have "specific knowledge of the childrearing practices." Eirinberg explained, again without contradiction, that there were not "significant differences in childrearing practices among the nine Sioux Tribes. They have different cultural practices, but the childrearing practices are essentially the same." Consequently, even though Eirinberg admitted the four deficiencies noted by this Court,[9] he still possessed specific knowledge of the childrearing practices necessary to assist the court in making a dispositional decision under the ICWA.
[¶ 37.] In its brief, the Cheyenne Sioux River Tribe notes "that the type of witness being referred to [in the federal law and regulations is] one who could assist the Court in determining whether the child-rearing practices exhibited by the parents were culturally-appropriate." I agree, but believe that Eirinberg's fourteen years of experience with thousands of clients was sufficient evidence to satisfy an abuse of discretion standard of review. After all, the ICWA expert is needed to answer two questions:
[f]irst, is it likely that the conduct of the parents will result in serious physical or emotional harm to the child? Second, if such conduct will likely cause such harm, can the parents be persuaded to modify this conduct?
BIA Guidelines for State Courts: Indian Child Custody Proceedings, 44 FedReg 67584 at 67593 (November 26, 1979). Furthermore, according to the BIA commentary, the test for experts proposing to answer these questions is simply whether the proposed expert "is qualified by reason of educational background and prior experience to make judgments on those questions that are substantially more reliable than judgments that would be made by nonexperts." Id. Certainly, someone with Eirinberg's extensive experience would provide more reliable judgments on these two questions than a nonexpert.
[¶ 38.] Finally, it must be emphasized that today's opinion is at odds with our two previous cases reviewing a trial court's decision to qualify an ICWA expert. In both cases, this Court found no abuse of discretion on records concerning experts with qualifications that were less than or equal to those possessed by Eirinberg.
[¶ 39.] For example, in K.A.B.E., 325 NW2d at 844, this Court found no abuse of discretion in a trial court's qualification of two witnesses with no experience unique to a particular tribe. Moreover, the foundation for their expertise was substantially inferior to that possessed by Eirinberg. The record in K.A.B.E. only reflected that one witness had "contact with Indians on a regular basis" and that the other witness was employed by a child care agency that served approximately thirty percent Indian children. Id. at 843. The entire extent of the qualifications approved by this Court in K.A.B.E. consisted only of the following:
The witnesses who testified were a social worker with the South Dakota Department of Social Services and the Director of the Children's Inn in Sioux Falls. The social worker has worked as such for over four years. She has a bachelor of arts degree in social work and has had contact with Indians on a regular basis. The Children's Inn is a shelter and resource center for children and parents involved with child abuse. The Director had a bachelor of science degree in social work and a year towards her master's degree. Approximately 30% of the children utilizing the Children's Inn are Indians.
Id. Notwithstanding this clearly less substantive and substantially more generalized foundation, this Court held "that sufficient evidence exists as to the qualifications of both witnesses under the ICWA." Id. at 844.
[¶ 40.] On the other hand, in D.M. this Court found no abuse of discretion in qualifying a state child protection manager with qualifications similar to those possessed by Eirinberg. The entire extent of the foundation approved in D.M. included the following:
[The proposed expert's] testimony revealed that she possessed the following qualifications: she managed the child protection program for five counties in South Dakota, including an area encompassing the Pine Ridge Indian Reservation; she had been employed by DSS for approximately fifteen years; she had prior experience in handling delinquent youth; she worked with tribal court and tribal agencies; she worked with Native American clients of the child protection program; she had attended several trainings relating to issues of family violence and child services for Native American families; she had attended trainings on ICWA and had previously been qualified as an ICWA expert.
2003 SD 49, ¶20, 661 NW2d at 773. Despite this similar foundation, this Court held that "[b]ased on these qualifications, the trial court did not abuse its discretion in determining the witness was a qualified expert under ICWA." Id.
[¶ 41.] Under the doctrine of stare decisis, we should decide similar cases in a similar manner. When I compare the sufficiency of the foundation approved in K.A.B.E. and D.M. to that presented here, I find it impossible to conclude that this trial court abused its discretion. Eirinberg's experience and training were more substantial than the others we have previously approved. Moreover, while neither of our prior decisions required any evidence of the specifics of the culture of the tribe at issue, Eirinberg provided record evidence of specifics through his consultation with other experts and his experience with similar tribes. And finally, even though there are differences in culture, this record contains uncontested evidence that the childrearing practices with which Eirinberg was familiar were not different from those of the Cheyenne River Sioux Tribe. Thus, this inconsistency in our decisions leaves future trial courts with an impossible dilemma: should they qualify a witness based upon the foundations approved in K.A.B.E. and D.M., or should they disqualify a witness with the more extensive foundation that the Court rejects today?
[¶ 42.] The result in this case is inconsistent with our prior decisions and the primary authority relied upon by the Cheyenne River Sioux Tribe. The Court's decision also fails to acknowledge all of the foundational evidence presented to the trial court. "[T]he trial court and [its] ruling in determining qualifications will not be disturbed unless there is no evidence that the witness had the qualifications of an expert. . . ." K.A.B.E., 325 NW2d at 844 (emphasis added). Because there is record evidence to support the trial court's decision to qualify Eirinberg as an expert, the trial court did not abuse its discretion.
NOTES
[1] CRST briefed this matter as an "appellee" but it is clear that they are in fact properly designated as an "appellant" as they assert error in the trial court's ruling.
[2] The use of the plural "expert witnesses" does not require more than one qualified expert to testify in support of termination. In Interest of D.G., 2004 SD 54, ¶ 11 n 2, 679 NW2d 497, 501.
[3] "It should be noted that the BIA did not promulgate their guidelines for state courts in Indian child custody proceedings as regulations because they were not intended to have binding legislative effect. However, the guidelines do represent the Department of Interior's interpretation of certain provisions of the ICWA in order to assure that the rights guaranteed by the ICWA are protected when state courts decide Indian child custody matters. See Guidelines for State Courts, supra at 67,584." Matter of Defender, 435 NW2d 717, 722 n 5 (SD 1989). Nevertheless, in interpreting the ICWA these" administrative interpretations of statutory terms are given important but not controlling significance." Matter of A.L., 442 NW2d 233, 236 (SD 1989)(citing Batterton v. Francis, 432 US 416 (1977)).
[4] In light of the criticisms made by the dissent, it is important to note that these first two subparts of the Guidelines specifically reference the "Indian child's tribe" and "tribal community."

Furthermore, under ICWA jurisdiction may also vest in the Indian child's tribal court; not any tribal court. 25 USC 1911(f). The legislative history and terms of ICWA are permeated with specific considerations for the Indian child's tribe.
[5] Appellants also point to the fact that Eirinberg conceded numerous times during his testimony that he was not an expert on Native American culture. However, reviewing his testimony in context this statement is not dispositive as he was saying that he is a "student" of Native American culture. This is in the same vein as an attorney or judge stating he or she is a "student" of the law. Each day brings professional opportunities for furthering one's education and experience in their field of expertise.
[6] Given this well-established tribal interest it is not too much to require an ICWA expert to be familiar with the child's tribe. Certainly, we would not approve an expert who had as little familiarity with the parents as this witness had with the tribe. If this witness had only read books about parenting would we consider him an expert on these parents?
[7] To demonstrate error in the State's expert testimony the CRST contrasts the testimony of Eirinberg with their own expert, Steven Emery, who was also qualified as an ICWA expert by the trial court. Emery is a member of the CRST, lives on the reservation and testified that he has substantial experience in Native American culture and child rearing practices. He was qualified by the trial court as an expert witness in Lakota culture without objection by the State. Emery testified that in this situation continued custody with the parents would not cause serious emotional or physical damage to the children though he did not recommend the children be returned to the home at this time. Though expert testimony is not required under ICWA for anyone other than the party advocating termination and this Court is not called upon to review the trial court's admission of this testimony for an abuse of discretion, this Court can recognize, as the trial court did in admitting this testimony, that the ICWA requires cultural identity to be a looking glass through which it is determined if continued custody by the Indian parent would likely result in serious emotional or physical harm to the children.
[8] I acknowledge that there is conflicting evidence concerning the precise level of Eirinberg's knowledge of Cheyenne River Sioux culture. However, Eirinberg unequivocally indicated that he was familiar with the relevant childrearing practices. See infra, ¶ 36.
[9] See supra, ¶13.